IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ROBERT STONE and MICHAEL DECARO, on behalf of themselves and others similarly situated, | : : : : | CIVIL ACTION NO. 1:16-CV-0371-MLB-JSA |
| Plaintiffs, | : : | |
| v. | : : | |
| U.S. SECURITY ASSOCIATES, INC. and DOES 1–10, inclusive, | : : : | **FINAL REPORT AND RECOMMENDATION ON A MOTION FOR SUMMARY JUDGMENT AND A MOTION FOR** |
| Defendants. | : | **CLASS CERTIFICATION** |

Plaintiffs Robert Stone and Michael DeCaro both applied for employment with Defendant U.S. Security Associates, Inc. ("Defendant" or "USSA"). As part of the application process, Plaintiffs executed a disclosure and authorization form, stating that they understood that Defendant would obtain their credit reports. Plaintiff DeCaro was later fired after his credit report revealed a criminal record. Plaintiffs now claim two violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, on both an individual and class basis:

- The Disclosure Claim (Count I). First, both Plaintiffs allege violations of the disclosure rule in § 1681b(b)(2). This provision requires an employer, before any background check, to disclose that a consumer report may be obtained for employment purposes, ***in a document that consists solely of the disclosure***. Here, while both Plaintiffs received an otherwise complete disclosure, they allege that the disclosure document did not "consist solely of the disclosure," and instead included other extraneous information.

- <u>The Adverse Action Claim (Count II)</u>. Section 1681b(b)(3) requires employers to provide other disclosures, before taking any adverse employment action based on a person's credit report. Plaintiff DeCaro alleges that he was terminated based on discovery of negative information in his credit report, without being furnished the statutorily-required prior notice.

The case is now before the Court on Plaintiffs' Motion for Class Certification [75] and Defendant's Motion for Summary Judgment [80]. At the Court's direction, the parties have also briefed the question of whether Plaintiffs—neither of whom allege any consequential injuries from these violations—have standing to bring either or both sets of claims. *See* Pl. Br. Jurisdiction [56]; Def. Br. Jurisdiction [57].

For the reasons explained below, the undersigned finds that Plaintiffs lack standing to assert the Disclosure Claim. The undersigned therefore **RECOMMENDS** that Stone's Disclosure Claim in Count I be **REMANDED** to the Superior Court of Los Angeles County, California (where it was originally filed), and that DeCaro's Disclosure Claim in Count I (which was originally filed in federal court) be **DISMISSED without prejudice** for lack of subject-matter jurisdiction.

The undersigned **FURTHER RECOMMENDS** that both Defendant's Motion for Summary Judgment [80] and Plaintiffs' Motion for Class Certification [75] as to the Adverse Action Claim (Count II) be **DENIED**. The result of these

recommendations, if adopted, would be that the case would proceed to trial in this Court as to Plaintiff DeCaro's individual claim in Count II.

## I.   BACKGROUND

Plaintiffs originally brought separate actions, which were then transferred to this Court and consolidated. Plaintiff Stone initiated this action by filing a Class Action Complaint [1-1] in the Superior Court of Los Angeles County, California, on December 14, 2015. Plaintiff Stone asserted one claim for relief, alleging that Defendant had violated § 1681b(b)(2) of the FCRA. *See* Compl. [1-1] at 3. Defendant removed this action to the United States District Court for the Central District of California on January 19, 2016. *See* Notice of Removal [1]. On February 5, 2016, pursuant to the stipulation of the parties, the District Judge in the Central District of California ordered the transfer of this action to this Court. *See* Order [12].

Plaintiff Michael DeCaro originally filed a Class Action Complaint in the United States District Court for the Middle District of Florida on June 3, 2015. *See* DeCaro Class Action Compl., No. 1:15-cv-3362-TCB (N.D. Ga. Jun. 3, 2016) (ECF No. 1). DeCaro asserted, among other claims, that Defendant had violated §§ 1681b(b)(2) and 1681b(b)(3) of the FCRA. *See id.* at 14–15. After an unopposed motion by Defendant, the District Judge in the Middle District of Florida ordered the

3

transfer of that action to the Northern District of Georgia on September 21, 2015. *See* Order, No. 1:15-cv-3362-TCB (N.D. Ga. Sept. 21, 2015) (ECF No. 23).

Both actions were temporarily stayed and administratively closed from late March 2016 until May 20, 2016, pending the United States Supreme Court's decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), which was anticipated to address the issue of standing to sue under the FCRA. *See* Minute Entry [20]; Minute Entry, No. 1:15-cv-3362-TCB (N.D. Ga. Mar. 24, 2016) (ECF. No. 70). After *Spokeo* was decided, the undersigned ordered the parties to file a consolidated amended complaint, and ordered that the actions would proceed as a single action under the *Stone* civil action number, 1:16-cv-0371-AT-JSA,[1] thereafter, and that the *DeCaro* case would be administratively closed. *See* Minute Entry [25]. Plaintiffs filed a Consolidated Class Action Complaint [26] on July 6, 2016. The undersigned then administratively closed the *DeCaro* action and ordered that this case would proceed as a consolidated action under the *Stone* civil action number. *See* Order, No. 1:15-cv-3362-TCB (N.D. Ga. July 22, 2016) (ECF No. 80).

The Court stayed and administratively closed this action from July 22, 2016 to April 3, 2017 while the parties attempted to settle through mediation. *See* Orders

---

[1] This action was subsequently reassigned from District Judge Amy Totenberg to District Judge Michael L. Brown on January 23, 2018, and the full docket number is now 1:16-cv-0371-MLB-JSA.

[29][31][34][36]. Defendant then filed a Motion to Dismiss [41] on May 3, 2017, seeking dismissal of class claims that sought to extend the statute of limitations under the FCRA from two to five years. After Plaintiffs indicated in a Response [42] that they did not oppose the Motion to Dismiss [41], the undersigned recommended that the Motion to Dismiss be granted. *See* Report and Recommendation [44]. The District Judge adopted the Report and Recommendation [44] as the Order of the Court on June 12, 2017. *See* Order [48]. Meanwhile, Defendant filed an Answer [47] to the Consolidated Class Action Complaint [26], and then filed an Amended Answer [53] on June 26, 2017.

On June 28, 2017, the Court ordered the parties to submit briefs on the Court's subject-matter jurisdiction over this case, specifically relating to standing, in light of the Supreme Court's decision in *Spokeo*. *See* Minute Entry [54]. The parties filed briefs on July 28, 2017. *See* Pl. Br. Jurisdiction [56]; Def. Br. Jurisdiction [57].

On November 6, 2017, Plaintiffs filed their Motion for Class Certification [75]. Defendant filed a Response [78] in opposition on December 11, 2017, and Plaintiff filed a Reply [84]. The Court later permitted Defendant to file a Sur-Reply [95]. *See* Order [94]. Defendant filed its Motion for Summary Judgment [80] on December 13, 2017, along with exhibits. Plaintiff filed a Response [86] in opposition, and Defendant filed a Reply [90].

## II.   FACTS

Unless otherwise indicated, the Court draws the following facts from Defendant's "Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment" [80-2] ("Def. SMF"). The Court also draws some facts from Plaintiff's "Response to Defendant's Summary of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment" [86-2] ("Pl. Resp. SMF"), as well as Plaintiff's "Separate Statement of Undisputed Material Facts" [86-1] ("Pl. SMF"), and Defendant's "Response to Plaintiffs' Separate Statement of Undisputed Material Facts" [91] ("Def. Resp. SMF") .

For those facts submitted by Defendant that are supported by citations to record evidence, and that Plaintiff has not specifically disputed and refuted with citations to admissible record evidence showing a genuine dispute of fact, the Court deems those facts admitted, pursuant to Local Rule 56.1B. *See* LR 56.1(B)(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not

material or otherwise has failed to comply with the provisions set out in LR 56.1 B(1).").

The Court has excluded assertions of fact by either party that are clearly immaterial, or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to admissible evidence in the record, or asserted only in a party's brief and not in its statement of facts. *See* LR 56.1B(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."); *see also* LR 56.1B(2)(b) (respondent's statement of facts must also comply with LR 56.1B(1)). Indeed, both parties object to some of the opposing party's proffered facts on various grounds, including that the asserted fact is not relevant or material to the claims and defenses presented in this case. Nevertheless, the Court includes certain facts that are not necessarily material, but which are helpful to present the context of the parties' arguments. The Court will not rule on each and every objection or dispute presented by the parties, and will discuss those objections and disputes in the analysis section only when necessary to do so regarding a genuine dispute of a material issue of fact.

Additionally, as indicated and as needed, the Court draws some facts directly from the record, including from the parties' exhibits submitted for consideration on

the Motion for Class Certification. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

For purposes of its recommended ruling on the Motion for Summary Judgment, the Court will view all evidence and factual inferences in the light most favorable to Plaintiffs, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

USSA is a private security company operating approximately 160 branch offices in the U.S., and employing over 50,000 security professionals. Def. SMF ¶ 1. Most of USSA's employees work as uniformed security guards. Def. SMF ¶ 3.

USSA provides standard forms for its branches to use in the employment application and on-boarding process. Def. SMF ¶ 4. USSA requires that every potential new hire receive and sign its onboarding disclosure form before a background check is run. Def. SMF ¶ 9.[2] This document informs applicants that USSA will obtain a report on them for employment purposes, and solicits the applicants' consent for USSA to do so. Def. SMF ¶ 10. USSA's disclosure form has

---

[2] Plaintiffs' partial objection to this fact, in which Plaintiffs raise concerns that Defendant did not attach to its evidence the entirety of the Disclosure Form given to DeCaro, is discussed below. *See* Pl. Resp. SMF ¶ 9.

been separate from the employment application since before June 3, 2013. Def. SMF ¶ 11.

As of June 3, 2013, all employment applications and on-boarding forms were completed in hard copy. Def. SMF ¶ 5. In November 2013, USSA began a staggered roll-out of a new electronic applicant tracking system called ApplicantStack, which allows job-seekers to apply and complete application and onboarding forms electronically. Def. SMF ¶ 6. Initially only corporate headquarters had access to ApplicantStack, but by February 2014, all of USSA's branches had access. Def. SMF ¶ 8.

USSA's disclosure form was originally adapted from a form USSA received from a vendor over a decade ago, and USSA has revised it multiple times. *See* Def. SMF ¶¶ 12–13. The revision process involves employees in USSA's Compliance Department—particularly Compliance Director Carol Longmore—as well as employees in the Human Resources Department and Legal Department. Def. SMF ¶¶ 14, 22. USSA revised the disclosure form in 2015 after Plaintiff Stone filed this lawsuit. Def. SMF ¶ 20. Neither Stone nor DeCaro received the 2015 version of the disclosure form. Def. SMF ¶ 21. The prior version of the form dated to 2011. Def. SMF ¶¶ 19–20. The Court refers to this version of the form, used between 2011 and 2015, hereinafter as the "Disclosure Form." Ultimately, Plaintiff Stone received and

completed the Disclosure Form in hard copy, and Plaintiff DeCaro received and completed the Disclosure Form electronically online through ApplicantStack. Def. SMF ¶¶ 51, 55.

The Disclosure Form includes details about the type of information that will be gathered on the candidate, where the information will come from, who will gather the information, to whom the information may be provided, and how to contact USSA to discuss the report. Def. SMF ¶ 16. It advises candidates of some of their rights under the FCRA and enables residents of certain states to request a copy of the report by checking a box; additionally, the Disclosure Form provides information about the accuracy and use of the identifying information requested, and about the candidate's rights under California law. Def. SMF ¶ 17.

The first six paragraphs of the Disclosure Form state, in their entirety:

1. I understand that an investigation report may be generated on me that may include information as to my character, general reputation, personal characteristics, or mode of living; work habits, performance or experience, along with reasons for termination of past employment/professional license or credentials; financial/credit history; education history; or criminal/civil/driving record history. I understand that an Agent Organization on behalf of **U.S. Security Associates (USA)** may be requesting information from public and private sources about any of the information noted earlier in this paragraph in connection with **U.S. Security Associates** consideration of me for employment, promotion or position re-assignment or contract now, or at any time during my tenure with **U.S. Security Associates**, and give my full consent for this information to be obtained. I also

authorize this information to be released to clients of U.S. Security Associates.

2. IF APPLICABLE, medical and worker's compensation information will only be requested in compliance with the Federal Americans with Disabilities Act (ADA) and/or any other applicable state laws. According to the **Fair Credit Reporting Act** (FCRA, Public Law 91-508, Title VI), I am entitled to know if the considerations for which I am applying are denied because of information obtained from a consumer reporting agency. If so, I will be notified and be given the name of the agency providing that report.

3. I acknowledge that an electronic, telephonic facsimile (FAX) or photographic copy of this release shall be as valid as the original. This release is valid for most federal, state and county agencies.

4. I understand that if I am a resident of **California, Minnesota or Oklahoma (only)** I may obtain a copy of the report ordered, and now indicate my desire to do so by checking this box. [symbol of box in hard copy version.] California candidates see "Notice of California Candidates" in box below.

5. I hereby authorize, without reservation, any financial institution, law enforcement agency, information service bureau, school, employer or insurance company contacted by a background investigation company to furnish the information described in Section 1.

6. Communications with USA should be addressed to U.S. Security Associates, Inc., ATTN: Compliance Manager, 200 Mansell Court, Fifth Floor, Roswell, GA 30076 or call 800-730-9599.

*See* Longmore Decl., Exs. A, H, I, [80-6] at 20, 173, 176, *see also* Pl. SMF.

¶¶ 10, 13, 16 (emphases in original).[3] Additionally, the Disclosure Form contains

the following two paragraphs:

---

[3] Exhibit A to the Longmore Declaration is a blank copy of the Disclosure Form. *See* Longmore Decl. [80-6] ¶ 12 ("Attached as Exhibit A is a true and accurate copy of the 2011 version of the Disclosure Form."). According to the Longmore

**FAIR CREDIT REPORTING ACT NOTICE**:

In accordance with the Fair Credit Reporting Act (FCRA, Public Law 91-508, Title VI) this information may only be used to verify a statement(s) made by an individual in connection with legitimate business needs. The depth of information available varies from state to state. Update status is available on request. Although every effort has been made to assure accuracy, Agent Organization obtaining this information for U.S. Security Associates, Inc. cannot act as guarantor of information accuracy or completeness. Final verification of an individual's identity and proper use of report contents are the user's responsibility. The Agent Organization for U.S. Security Associates, Inc. policy requires purchasers of these reports to have signed a Service Agreement. This assures the Agent Organization that users are familiar with and will abide by their obligations, as stated in the FCRA, to the individuals named in these reports. If information contained in this report is responsible for the suspension or termination of an employee or the application process, have the Candidate/employee contact the Agent Organization.

**NOTICE TO CALIFORNIA CANDIDATES**:

You have a right to obtain a copy of any consumer report obtained by U.S. Security Associates, Inc. by checking the box in paragraph IV above. The report will be provided to you within three (3) business days after we receive the requested reports related to the matter investigated. Under section 1786.22 of the California Civil Code, you may view the file maintained on you by our Agents during normal business hours. You may also obtain a copy of this file upon submitting proper identification and paying the costs of duplication services, by appearing at U.S. Security Associates, Inc. in person or by mail. You may also receive a summary of the file by telephone. The agency is required to

---

Declaration, Exhibit H is a copy of the Disclosure Form signed by Stone and Exhibit I is a copy of the Disclosure Form signed by DeCaro. *See id.* ¶ 36. It appears to the Court that all three documents contain the same text of Paragraphs 1–6, although the form DeCaro signed is missing the number "1." at the beginning; the first bolded word "associates" is not capitalized; and the word "release" in the final sentence is stated in present rather than past tense. *See* Longmore Decl. Ex. H [80-6] at 176.

have personnel available to explain your file to you and the agency
must explain to you any coded information appearing in your file. If
you appear in person, a person of your choice may accompany you,
provided that this person furnishes proper identification.

Longmore Decl, Exs. A, H [80-6] at 20, 173, DeCaro Decl. Ex. 1 [75-5] at 7; *see also*

Pl. SMF ¶¶ 19, 22. [4]

On February 12, 2014, Plaintiff Stone completed a hard-copy application for
employment with USSA. Def. SMF ¶ 50. During Stone's on-boarding process with
USSA, he was provided with the Disclosure Form in hard copy and completed it on
or about February 11, 2014. Def. SMF ¶ 51. USSA ran a background check on
Stone, and he met USSA's hiring criteria. Def. SMF ¶ 52. Stone was hired by
USSA's Branch 152, in Commerce, California, to work as a Post Commander, a
type of security guard. Def. SMF ¶ 53.

Plaintiff   DeCaro   completed   USSA's   online   application   through
ApplicantStack in or about March 2015. Def. SMF ¶ 54. DeCaro received and

---

[4] These final two paragraphs of the Disclosure Form ("Fair Credit Reporting Act
Notice" and "Notice to California Candidates") are missing from the copy of the
Disclosure Form executed by DeCaro that Defendant attached as Exhibit I to the
Longmore Declaration. *See* Longmore Decl., Ex. I [80-6] at 176; Pl. Resp. SMF ¶ 9.
Plaintiffs have filed their own competing copies of the Disclosure Form, as Exhibits
1 and 2 to a declaration by Plaintiffs' counsel, *see* Dion-Kindem Declaration, Exs.
1–2 [86-3], although Defendant challenges whether this evidence is properly
authenticated. The Court, however, does not find this evidentiary dispute to be
material, both because the existence of any violation does not specifically turn on the
presence of these two paragraphs, and more generally because (as explained below)
Plaintiffs lack standing to assert the Disclosure Claim.

completed the Disclosure Form via ApplicantStack on March 24, 2015. Def. SMF ¶ 55. DeCaro was hired by USSA's Branch 305 in Lakeland, Florida; he worked first in an administrative role and then in a security role directing USSA's security staffing for the SUN 'n FUN festival in Lakeland. Def. SMF ¶ 56.

USSA was aware of its obligation under the FCRA to provide candidates with a copy of their background report, a summary of their rights under the FCRA, and a reasonable period of time before taking any adverse action on the basis of the report. Def. SMF ¶ 57. USSA contracted with S2Verify, LLC ("S2Verify") to conduct background checks and send any required adverse action notifications stemming from USSA's use of the resulting reports. Def. SMF ¶ 59. S2Verify specializes in, among other things, administering FCRA-compliant pre-employment screens. Def. SMF ¶ 58. S2Verify is one of 11 such vendors that USSA used "during the relevant class period"[5] to provide background checks on applicants. Def. SMF ¶ 60. The "pre-adverse action" notification S2Verify sent on behalf of USSA included: a copy of the background report at issue, a cover letter advising the candidate of his right to dispute the accuracy or completeness of the information in the report, and a copy of "A Summary of Your Rights Under the Fair Credit Reporting Act." Def. SMF ¶ 61.

---

[5] Defendant states in other filings that it interprets the relevant class period to be from June 3, 2013 to April 13, 2015. *See* Def. Br. Mot. Class Cert. [78] at 4 n.1.

On March 24, 2015, Branch 305 ordered a background check on DeCaro from S2Verify. Def SMF ¶ 62. That same day, S2Verify made DeCaro's background check results available to Longmore for her individual review and assessment. Def. SMF ¶ 63. S2Verify coded DeCaro's report as "for client review," which meant that the report contained a potentially disqualifying record. Def. SMF ¶ 64. Longmore reviewed DeCaro's background report on April 14, 2015. Def. SMF ¶ 65. The report contained a marijuana conviction in DeCaro's criminal record, which in Longmore's judgment disqualified DeCaro from working for USSA. *Id.* Longmore notified Branch 305 on that date, April 14, 2015, that DeCaro's employment should be terminated. *Id.*[6] Still, on April 21, 2015, Branch 305 submitted supplemental information explaining the circumstances of DeCaro's criminal history, and asked for leniency in Longmore's review. Def. SMF ¶ 66. This document incorporated a detailed explanation, appearing to include information from DeCaro himself. *See* Longmore Decl. [80-6] at 178; *see also* Longmore Decl. ¶ 42. This supplemental information did not persuade Longmore, and USSA concluded that DeCaro should

---

[6] Plaintiffs claim that Longmore stated in her Declaration [80-6] that she instructed the branch to terminate DeCaro "***immediately***." *See* Pl. Resp. SMF ¶ 65 (emphasis in Pl. Resp. SMF). Plaintiff argues that this violated the FCRA's requirement to provide a five-day notice period. *See id.* The record does not indicate that Longmore used the word "immediately." But Longmore nevertheless stated that she notified the branch that Plaintiff should be terminated on "that day" that she reviewed the credit report and concluded that it revealed disqualifying information.

be terminated. Def SMF ¶ 67. DeCaro's last day of work was April 27, 2015. Def. SMF ¶ 68.

Longmore believed based on "directives sent to S2Verify" that DeCaro had been sent a timely pre-adverse action letter. Def. SMF ¶ 69. Longmore did not learn that DeCaro had not been sent a pre-adverse action letter at all, and that the failure to do so was an administrative error, until the filing of DeCaro's lawsuit. Def. SMF ¶ 70. According to the "processes established," DeCaro's letter should have been sent at least ten days before April 27, 2015. Def. SMF ¶ 71. DeCaro thus should have received, but did not receive, a pre-adverse action notice prior to being terminated from employment. Pl. SMF ¶ 59.

Over the course of USSA's relationship with S2Verify, Longmore worked directly with S2Verify employees, including the company president, Jim Zimbardi, to ensure that S2Verify was complying with its contractual obligation to send adverse action notifications at the appropriate time. Def. SMF ¶ 72. Longmore met in person with Zimbardi in 2013 to discuss, among other things, the importance of consistently mailing pre-adverse action letters as required. Def. SMF ¶ 73. Based on Zimbardi's representations, Longmore believed the notices were being sent appropriately. Def. SMF ¶ 74. Upon learning of DeCaro's lawsuit against USSA, Longmore requested that S2Verify provide her with the dates that his adverse action

letters had been mailed. Def. SMF ¶ 75. S2Verify advised at that time that they had not, in fact, gone out, and it was investigating the cause. Def. SMF ¶ 76. Since that time, S2Verify has determined that it did not send DeCaro his pre-adverse action letter because the administrative email address that sent notice to S2Verify when a report was completed or updated, triggering the letters to be mailed, had been removed. Def. SMF ¶ 77. It is unknown who deleted the email address, Def. SMF ¶ 78, but according to Zimbardi, the individual who deleted the address was a USSA representative within DeCaro's branch. *See* Zimbardi Decl. [80-10] ¶ 5.

## III.   DISCUSSION

### A.   *Standing*

Federal courts cannot exercise jurisdiction over cases in which the parties lack standing. *Fla. Wildlife Federation, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2001). Article III of the Constitution limits the judicial power of the federal courts to the resolution of "Cases" and "Controversies," and thus, restricts the jurisdiction of the federal courts to litigants who have standing to sue. *Nicklaw v. Citimortgage, Inc.*, 839 F.3d 998, 1001 (11th Cir. 2016) (citing U.S. Const. Art. III § 2). Accordingly, "standing is a jurisdictional threshold question which must be addressed prior to and independent of the merits of a party's claims." *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir. 2008). "Questions of

subject matter jurisdiction may be raised . . . at any time during the pendency of proceedings." *Ingram v. CSX Transp., Inc.*, 146 F.3d 858, 861 (11th Cir. 1998). Indeed, federal courts "are obliged to consider standing *sua sponte* even if the parties have not raised the issue." *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007).

Pursuant to its obligation to assure itself of its subject-matter jurisdiction over the claims in this case, on June 28, 2017, the Court ordered the parties to submit briefing on standing. *See* Order [54]. Plaintiffs asserted that they and all of their putative class members had standing. *See* Pl. Br. Jurisdiction [56]. Defendant stated that Plaintiff DeCaro had standing to assert the Adverse Action Claim, but argued that Plaintiffs lacked standing to bring the Disclosure Claim under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). *See* Def. Br. Jurisdiction [57] at 2–5. Still, Defendant averred that the Court could allow discovery to determine whether Plaintiffs conceivably suffered an injury in fact for purposes of their standing to assert the Disclosure Claim. *See id.* at 6.

For the reasons discussed below, the Court concludes that the named Plaintiffs do not have standing to assert the Disclosure Claim, but that Plaintiff DeCaro has standing to assert the Adverse Action Claim.

1.      Legal Standards Governing Standing under the FCRA

The "irreducible constitutional minimum of standing" consists of three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). First, the plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks omitted). Second, "the injury has to be fairly traceable to the challenged action of the defendant." *Id.* (internal quotation marks and brackets omitted). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted).

A plaintiff has an injury in fact for purposes of the standing inquiry if she has suffered an invasion of a legally protected interest that is concrete, particularized, and actual or imminent. *Nicklaw*, 839 F.3d at 1002 (citing *Lujan*, 504 U.S. at 560). A mere intangible injury may give rise to a plaintiff's standing under Article III so long as the injury is "concrete," that is, "it must actually exist." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). As the Supreme Court has explained:

> In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles. Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally

been regarded as providing a basis for a lawsuit in English or American courts. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 775–777, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). In addition, because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important. Thus, we said in *Lujan* that Congress may "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." 504 U.S., at 578, 112 S.Ct. 2130. Similarly, Justice Kennedy's concurrence in that case explained that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.,* at 580, 112 S.Ct. 2130 (opinion concurring in part and concurring in judgment).

*Id.* at 1549. Nevertheless, "a plaintiff does not 'automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Nicklaw*, 839 F.3d at 1002 (quoting *Spokeo*, 136 S. Ct. at 1549).

*Spokeo* represents the Supreme Court's most recent discussion of standing in the context of the FCRA. In that case, the defendant was an alleged consumer reporting agency that aggregated substantial amounts of information about individuals from a variety of underlying sources, including addresses, telephone numbers, and data showing individuals' ages, and provided that information upon request to online customers. *Spokeo*, 136 S. Ct. at 1546. At some point, a third party allegedly ran a Spokeo search request for information about the plaintiff, Robins. Robins became aware of the search, and discovered that much of the information

20

provided to the unnamed searcher was "inaccurate." *Id.* Robins sued Spokeo for revealing inaccurate information under the FCRA, and Spokeo challenged whether Robins had articulated sufficient standing under Article III. The Ninth Circuit found in Robins's favor, because he alleged that "Spokeo violated his statutory rights, not just the statutory rights of other people," and because his "personal interests in the handling of his credit information are individualized rather than collective." *See Robins v. Spokeo*, 742 F.3d 409, 412–13 (9th Cir. 2014).

The Supreme Court vacated that ruling, and remanded the case to the Ninth Circuit to address the separate questions of whether particularized *and* concrete harm existed. *See Spokeo*, 136 S. Ct. at 1550 ("Because the Ninth Circuit failed to fully appreciate the distinction between concreteness and particularization, its standing analysis was incomplete. It did not address the question framed by our discussion, namely, whether the particular procedural violations alleged in this case entail a degree of risk sufficient to meet the concreteness requirement. We take no position as to whether the Ninth Circuit's ultimate conclusion—that Robins adequately alleged an injury in fact—was correct.")

Under *Spokeo*, "a bare procedural violation, divorced from any concrete harm," does not satisfy the injury-in-fact requirement of Article III standing. *See id.* at 1549. In some circumstances, "[t]he violation of a procedural right granted by

21

statute can be sufficient . . . to constitute injury in fact. In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Id.* Still, "deprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing." *Id.* (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009)).

The party invoking federal jurisdiction bears the burden of establishing the elements of standing. *Lujan*, 504 U.S. at 555. In this case, Plaintiff DeCaro invoked federal jurisdiction when he filed his original complaint in federal court, and therefore bears the burden to show that he has standing. Defendant, however, bears the burden to establish that Plaintiff Stone has standing, as Defendant removed the *Stone* civil action to federal court. *See Nicholson v. Nat'l Accounts, Inc.*, 105 F. Supp. 2d 1290, 1293 (S.D. Ala. 1999) (defendant has burden on removal to demonstrate that the plaintiff has standing).

### 2.   Plaintiffs' Standing on the Disclosure Claim

Plaintiffs assert the Disclosure Claim against Defendant in Count I of the Complaint. *See* Compl. ¶¶ 24–42. Plaintiffs claim that both of them applied for a job with Defendant, and were provided with and executed an "Applicant Consent Form," which also purported to include all of the statutorily-required disclosures. Compl. ¶¶ 30–31. While Stone received the Disclosure Form in hard copy, and

DeCaro received it online via ApplicantStack, the text of the form was the materially the same for both Plaintiffs.

Plaintiffs assert that Defendant violated § 1681b(b)(2) of the FCRA. Compl. ¶ 33. That section provides, in relevant part,

> (2) Disclosure to consumer
>
> (A) In general. Except as provided in subparagraph (B), a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless—
>
>> (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, *in a document that consists solely of the disclosure*, that a consumer report may be obtained for employment purposes; and
>>
>> (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person.

15 U.S.C. § 1681b(b) (emphasis added).

It is undisputed that the forms received by Plaintiffs provided the substantive information required by this provision, that is, notice that a consumer report was being obtained for employment purposes. Plaintiffs contend, rather, that Defendants' form also improperly included *other* information, waivers, and statements on this same form as well, and thus did not provide a document "that consists solely" of the disclosure, as required by § 1681b(b)(2)(A)(i). The items of additional information that Plaintiffs contend should not have been included on the

"stand-alone" disclosure form include the final sentence of Paragraph 1, which reads, "I also authorize this information [i.e., the credit report being obtained] to be released to clients of U.S. Security Associates." (the "Client Release Clause"), as well as various other notices and disclosures under several individual state laws. *See* Pl. Br. MSJ [86] at 1–2.

Notably, neither Plaintiff alleges that he suffered any confusion, or was misled into agreeing to release his information, or suffered any other specific harm, by receiving a disclosure in a non-stand-alone format. The question before the Court, therefore, is whether a Plaintiff who receives the necessary information, but not in the required stand-alone format, and who otherwise suffers no confusion as a result, has established sufficient "concrete" harm to give rise to standing, or whether such a Plaintiff has suffered a mere "procedural violation."

Plaintiffs state that their injury for purposes of the Disclosure Claim is both an informational injury and an injury of invasion of privacy. *See* Compl. ¶¶ 40–41; Pl. Br. Jurisdiction [56] at 2. The informational injury that Plaintiffs assert is that they did not receive the disclosure that a consumer report may be obtained for employment purposes in a document consisting solely of the disclosure. *See* Compl. ¶ 41. Plaintiffs assert a privacy injury based on the statutory prohibition on obtaining

a consumer report for employment purposes without first providing a proper disclosure and securing authorization. *See* Compl. ¶ 40.

The Eleventh Circuit has recently addressed standing on the basis of informational injury in *Church v. Accretive Health, Inc.*, 654 F. App'x 990, 994–95 (11th Cir. 2016). In *Church*, it was undisputed that the defendant had sent the plaintiff a letter that omitted certain information required to be disclosed by the Fair Debt Collection Practices Act. *See id.* The Eleventh Circuit found that the plaintiff had alleged more than just a bare procedural violation. Because an injury need not be tangible to be concrete, and that Congress had created a right to receive particular information, the court found that the plaintiff's alleged deprivation of this required information was sufficiently "real" and concrete to give rise to standing, even absent tangible harm. *See id.* at 995 (citing *Spokeo*, 136 S. Ct. at 1549).

Similarly, in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368–74 (1982), the Supreme Court held that a plaintiff had standing to assert violations of the Fair Housing Act for being given false information about the availability of apartment housing even though the plaintiff, a so-called "tester" plaintiff—was not actually intending to rent an apartment. The absence of any actual injury to the plaintiff in *Havens Realty* was no barrier to the presence of standing—rather, the plaintiff had standing by way of the clear injury to the right to truthful housing information

25

created by the statute. *See* 455 U.S. at 374; *see also Federal Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998) ("inability to obtain information" that Congress decided to make public was sufficient injury in fact); *Public Citizen v. Dept. of Justice*, 491 U.S. 440, 449 (1989) (failure to obtain information subject to disclosure under federal statute was sufficient injury).

This case raises a different question, however, to the one presented in cases such as *Church* or *Havens Realty*. In those cases, the plaintiffs alleged that they were denied specific information to which they were entitled by statute. In this case, it is undisputed that Plaintiffs Stone and DeCaro received the information that Congress required, although they allege that it was not in the correct format.

Neither the Eleventh Circuit nor Supreme Court has ruled as to whether a plaintiff has standing to assert a bare violation of the FCRA's stand-alone disclosure requirement, absent any allegation of actual confusion or misunderstanding. Some district courts have upheld plaintiffs' standing in these circumstances. *See, e.g., Hargrett v. Amazon.com DEDC LLC*, 235 F. Supp. 3d 1320, 1325–28 (M.D. Fla. 2017); *Graham v. Pyramid Healthcare Solutions, Inc.*, No. 8:16-cv-1324-T-30AAS, 2016 WL 6248309, at *2 (M.D. Fla. Oct. 26, 2016); *Moody v. Ascenda USA Inc.*, No. 16-cv-60364-WPD, 2016 WL 5900216, at **5–6 (S.D. Fla. Oct. 5, 2016). For

example, in *Moody*, the court found that the stand-alone disclosure requirement of

§ 1681b(b)(2) creates both informational and privacy rights:

> [Section] 1681b(b)(2) establishes two rights. First, it establishes a right
> to specific information in the form of a clear and conspicuous
> disclosure. The statutory requirement that the disclosure be made in "a
> document that consists solely of the disclosure" helps to implement the
> textual command that the disclosure be clear and conspicuous. Second,
> § 1681b(b)(2) establishes a right to privacy in one's consumer report
> that employers may invade only under stringently defined
> circumstances. Those protections are clearly substantive, and neither
> technical nor procedural.

2016 WL 5900216 at *6 (quoting *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623,

631–32 (E.D. Va. 2016)). The *Moody* court, which quoted the plaintiffs' complaint

at length, made no mention of any allegation by the plaintiffs of any actual confusion

or actual non-receipt of the FCRA disclosure—thus, the court apparently found

standing even without the need for any such allegations. *See id.* at **3–6.

However, the emerging majority view—including from at least one published

Circuit Court opinion, *see Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887

(7th Cir. 2017), and two opinions in this District, *LaFollette v. RoBal, Inc.*, No.

1:16-cv-2592-WSD, 2017 WL 1174020 (N.D. Ga. Mar. 30, 2017) (Duffey, J.), and

*Cooper v. Academy Mortgage Corporation (UT)*, No. 1:16-cv-1546-LMM-CMS,

2017 WL 8186733, at **5–8 (N.D. Ga. Nov. 27, 2017) (Salinas, M.J.), *report and*

*recommendation adopted*, No. 1:16-CV-1546 (N.D. Ga. Mar. 6, 2018) (May, J.)—is

that standing does *not* exist in these circumstances.

In *Groshek*, the Seventh Circuit held that to demonstrate more than a "bare

procedural violation," a plaintiff must show that the statutory violation presents an

"appreciable risk of harm" to the "underlying concrete interest that Congress sought

to protect by enacting the statute." *See id.* (citations omitted).[7] The plaintiff in

*Groshek* did not allege that he was confused by the disclosure form he received, or

that he did not understand the consent he gave for a consumer report to be obtained

for employment purposes. Rather, just as Plaintiffs here, he merely alleged that he

received a disclosure form that contained extraneous information in violation of the

FCRA. *See id.* The court held that the plaintiff's challenge simply to the format of

the disclosure was "completely removed from any concrete harm or appreciable risk

of harm." *See id.* As the Seventh Circuit explained, "Congress did not enact

---

[7] Although the Eleventh Circuit has not used this precise formulation, the D.C. Circuit and Fourth Circuit also require plaintiffs claiming a concrete informational injury to demonstrate some harm to the interest Congress sought to protect. *See Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) ("A plaintiff suffers sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."); *Dreher v. Experian Information Solutions, Inc.*, 856 F. 3d 337, 345–46 (4th Cir. 2017) (finding the D.C. Circuit's reasoning in *Friends of Animals* persuasive).

§ 1681b(b)(2)(A)(i) to protect job applicants from disclosures that do not satisfy the requirements of that section; it did so to decrease the risk that a job applicant would unknowingly consent to allowing a prospective employer to procure a consumer report." *See id.* The court also rejected the plaintiff's claim of a privacy injury because the plaintiff admitted that he had signed the disclosure and authorization form. *See id.* at 889.

The "vast majority" of district courts that have considered the question, including several within this Circuit, appear to agree that a violation of stand-alone disclosure requirement does not automatically cause a concrete injury. *See Stacy v. Dollar Tree Stores, Inc.*, 274 F. Supp. 3d 1355, 1363 (S.D. Fla. 2017) (collecting cases)*, LaFollette*, 2017 WL 1174020, at *3 nn. 2–3 (collecting cases).

The Court finds particularly instructive the persuasive opinions of two District Judges in this District, in *LaFollette* and *Cooper*. In *LaFollette*, Judge Duffey addressed essentially the same question presented to the Court here, that is, whether a plaintiff who did not allege any confusion lacked standing to assert a stand-alone disclosure claim pursuant to § 1681b(b)(2)(A)(i). Judge Duffey's opinion characterized the plaintiff's claim as one of not receiving statutorily mandated information "in the format required." *See id.* at *3. The court stated that "[a] statutory right to information is substantive. A statutory right to receive that

information in a particular format is procedural." *See id.* at *4 (quoting *Landrum v. Blackbird Enters., LLC*, No. Cv H-16-374, 214 F. Supp. 3d 566, 571 (S.D. Tex. 2016)). The court thus concluded the plaintiff had only alleged a bare procedural violation rather than a concrete informational injury. *See id.* at *4. The court also rejected plaintiff's invasion-of-privacy theory, because whether or not the disclosure was properly provided on a stand-alone form, the plaintiff did, in fact, receive the FCRA's required disclosure that a consumer report would be obtained, and authorized the procurement of such a consumer report. *See id.* at *5 (citing *In re Michaels Stores*, MDL No. 2615, 2017 WL 354023, at *3 (D.N.J. Jan. 24, 2017)). The court dismissed the case for lack of subject-matter jurisdiction because the plaintiff had not established an injury in fact. *Id.*

Similarly, in *Cooper*, Magistrate Judge Salinas of this Court found that a plaintiff making similar allegations to those here did not suffer the harm addressed by the stand-alone disclosure rule, absent any allegations that the plaintiff misunderstood the consent being given or that she was confused or misled as to the form's contents. *See Cooper*, 2017 WL 8186733, at *7 ("Here, Plaintiff has not alleged that she suffered the harm addressed by Congress's promulgation of the stand-alone disclosure rule—namely, that she did not understand that she was authorizing an employer background check.") Judge May adopted this

recommendation, and dismissed the case for lack of standing, because, "[u]nder the particular facts of this case, where Plaintiff has not pled she was misled or confused by the extraneous information *or* that the extraneous information's inclusion affected her decision to sign the Consent Form, Plaintiff has not suffered a concrete injury for the reasons cited by the Magistrate Judge." *Cooper*, No. 1:16-CV-1546 (N.D. Ga. Mar. 6, 2018) (slip op.).

*Groshek*, *Cooper, LaFollette*, and the rest of this emerging majority, are also consistent with the Ninth Circuit's holding in *Syed v. M-I, LLC*, 853 F.3d 492, 499 (9th Cir. 2017). Like Plaintiffs in this case, the plaintiff in *Syed* sued the defendant for violations of the stand-alone disclosure requirement of § 1681b(b)(2) of the FCRA. *See* 853 F.3d at 498. The plaintiff sought only statutory and punitive damages, but not actual damages. *Id.* at 503. The Ninth Circuit did not address the standing question presented in this case, which is whether a plaintiff can have standing based solely on an allegation that the defendant violated the stand-alone disclosure requirement. Instead, the Ninth Circuit found that one of the Plaintiff's factual allegations[8] was sufficient to *infer* that the plaintiff was deprived of the

---

[8] The plaintiff's allegation was that he "discovered Defendant M-I's violation(s) within the last two years when he obtained and reviewed his personnel file from Defendant M-I and discovered that Defendant M-I had procured and/or caused to be procured a 'consumer report' regarding him for employment purposes based on the illegal disclosure and authorization form." *See Syed*, 853 F.3d at 499.

rights to information and privacy, because the allegation indicated the plaintiff was not aware that he was signing a waiver authorizing a credit check when he signed it. *Id.* at 499. The Ninth Circuit also inferred "that Syed was confused by the inclusion of the liability waiver with the disclosure and would not have signed it had it contained a sufficiently clear disclosure, as required in the statute." *Id.* at 499–500. Thus, the Ninth Circuit found standing based not only on an inference that the plaintiff misunderstood the defendant's disclosure form, but also on the inference that the plaintiff would not have executed the form but for his confusion.

As noted above, Defendant in its brief on jurisdiction took the position that neither Plaintiff alleged enough facts in the Complaint to support standing on the Disclosure Claim. *See* Def. Br. Jurisdiction [57] at 2–6. In its brief on the Motion for Class Certification, citing *Groshek*, *Stacy*, and other authority, Defendant agreed that any plaintiff must "plausibly allege—and then prove—'that he was confused by the disclosure form or the form's inclusion of [extraneous information], or that he would not have signed it had the disclosure complied with [the FCRA]." *See* Def. Br. Class Cert. [78] at 13–14 (quoting *Groshek*, 865 F.3d at 889 (7th Cir. 2017)).

At this juncture, however, while Defendant has not withdrawn its position on standing, Defendant has not requested summary judgment on this specific basis. Rather, Defendant affirmatively raises this issue solely as a ground to challenge

class certification. *See id*. Specifically, Defendant cites Plaintiff DeCaro's deposition testimony that he was actually confused by Defendant's Disclosure Form, and did not want to sign the authorization on the form, but did so because he was told it was a prerequisite to being hired. *See* DeCaro Dep. 34:2–9. Defendant suggests that such individualized facts could be relevant to any particular class member's standing, and that a class action would be an improper mechanism given the existence of such individualized issues.

Nevertheless, as the Court has noted, standing is a jurisdictional prerequisite, and the Court is obliged to consider whether standing exists regardless of the parties' positions or lack thereof. Therefore, even though Defendant has not affirmatively requested *dismissal* of Plaintiffs' claims on grounds of standing, the Court must dismiss (or remand) without prejudice if it determines that Plaintiffs lack standing. The record and arguments regarding standing are fully developed to address this question, as standing has been specifically briefed by the parties both in a series of jurisdictional briefs requested by the Court, as well as in the context of the class certification motion. Therefore, the Court considers the matter ripe to adjudicate at this time.

For all of the reasons explained above, the Court agrees that the majority rule espoused in *Groshek*, *Cooper*, *LaFollete*, *Stacy*, *Landrum*, *In re Michaels*, and other

cases, applies. As a result, there is no standing based on a mere procedural violation of the stand-alone disclosure rule. As in those cases, it is undisputed that Plaintiffs received the information required by the FCRA that a consumer report would be obtained for employment purposes, and that each Plaintiff signed an authorization for such a consumer report to be obtained by Defendant. The Complaint also lacks any allegations that Plaintiffs Stone or DeCaro were confused or misled or were unaware that a consumer report would be procured for employment purposes. Therefore, just as the above-cited cases found, the Plaintiffs in this case do not have constitutional standing and their claims should be dismissed without prejudice (or remanded) for lack of jurisdiction.

The Court sees no basis, as Defendants appear to wish, to apply this ruling solely as it relates to class certification, but not to the substantive claims of the named Plaintiffs. As to Plaintiff Stone, there is no suggestion of any allegation or fact at all to establish more than a mere procedural violation of the stand-alone disclosure requirement. The question is slightly more complicated as to Plaintiff DeCaro, who has also never alleged that he was confused or misled, although he later testified that he was. Facts adduced only in discovery, however, do not in any of themselves give rise to standing, absent appropriate allegations or amendments to the allegations.

The party bearing the burden of proof must support each element of standing "in the same way as any other matter on which [the party] bears the burden of proof," *i.e.,* with "the manner and degree of evidence required at the successive stages of the litigation." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005) (quotation omitted). What the party must prove depends on the nature of the challenge to the plaintiff's standing. *See id.* at 976. At summary judgment, the Court looks beyond the complaint to the depositions and other evidence in considering a *factual* challenge to standing. *Id.* However, "in making the necessary preliminary determination of *what claims the plaintiff has actually raised* (and therefore, what claims he must have standing to raise), we are bound by the contents of the plaintiff's pleadings, even on summary judgment." *Id.* In other words, the "preliminary" inquiry of standing is *facial,* not factual, and before the Court can consider whether the facts show that Plaintiffs have standing, it must consider whether Plaintiffs have *claimed in their Complaint* [26] to have suffered a constitutionally sufficient injury in the first place.

Here, therefore, simply because Plaintiff DeCaro acknowledged some confusion in response to Defendant's questions at a deposition does not—absent allegations explaining such confusion as the basis for his injury—give rise to standing. Rather, Plaintiff DeCaro, who bears the burden to establish jurisdiction,

must *allege* his injury. DeCaro not only fails to allege any confusion or related injury, but appears to affirmatively disclaim that such claim is the basis of his case. *See* Pl. Reply Br. Class Cert [84] at 4 ("Under Plaintiffs' theory of liability, Defendant is liable based on its clear violation of the stand-alone requirements ***regardless*** of whether Plaintiffs or any class member 'understood' that he or she was authorizing the procurement of a background check or was 'confused' by the addition of any extraneous language.") (emphasis in original).[9]

Thus, Plaintiffs do not allege any facts from which the Court could infer that they suffered actual confusion or any other harm aside from the statutory violation alone. Plaintiffs therefore have failed to allege a sufficiently concrete injury in fact to have Article III standing on the Disclosure Claim. Accordingly, the Court **RECOMMENDS** that Stone's Disclosure Claim Count I of the Complaint be **REMANDED** to the Superior Court of Los Angeles County, California, and that DeCaro's Disclosure Claim in Count I of the Complaint be **DISMISSED without prejudice** for lack of subject-matter jurisdiction.

---

[9] Plaintiffs, who have amended their claims and filed a joint consolidated complaint, do not request permission to amend to allege facts to establish their standing, and appear to instead insist on a non-individualized theory of standing so as to preserve their intent to pursue a class action. Should Plaintiffs, or either of them, make such a request to amend the factual allegations relating to their own standing, the Court would entertain such a request at that time. In any event, any dismissal of the Disclosure Claim on grounds of lack of standing would be without prejudice.

3.      Standing of DeCaro on the Adverse Action Claim

Plaintiff DeCaro asserts the Adverse Action Claim in Count II. DeCaro asserts that USSA violated § 1681b(b)(3) of the FCRA by taking adverse action against him based on information contained in his consumer report without first providing him with a copy of the report. Compl. ¶¶ 43–47. He also alleges that Defendant failed to provide him with a summary of his rights. *See* Compl. ¶ 57. DeCaro asserts that Defendant committed this violation willfully. Compl. ¶ 47.

Section 1681b(b)(3) of the FCRA provides, in relevant part:

(3) Conditions on use for adverse actions

(A) In general. Except as provided in subparagraph (B), in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—

(i) a copy of the report; and

(ii) a description in writing of the rights of the consumer under this subchapter, as prescribed by the Bureau under section 1681g(c)(3) of this title.

15 U.S.C. § 1681b(b)(3).

DeCaro asserts that he suffered an informational injury with regard to the Adverse Action Claim because he did not receive information to which he was entitled: a copy of the consumer report that Defendant relied on to make its termination decision prior to Defendant making that decision, and a statement of his

37

rights. *See* Compl. ¶¶ 54–56; Pl. Br. Jurisdiction at 19. DeCaro argues that Defendant's violation of § 1681b(b)(3) further deprived him of the opportunity to explain any objections to the accuracy of the report or otherwise correct the record as necessary before Defendant took adverse action. *See* Pl. Br. Jurisdiction at 20 (citing *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 638 (E.D. Va. 2016)).

Defendant in its initial brief on jurisdiction conceded that Plaintiff DeCaro possesses standing to assert the Adverse Action Claim, at least based on the Complaint. *See* Def. Br. Jurisdiction at 6. Defendant now states, however, again only in opposing class certification, that DeCaro "arguably" does not have standing based on the facts adduced in discovery. *See* Def. Br. Class Cert. at 21. Defendant points out that DeCaro does not claim that anything in his consumer report obtained by Defendant was false, or that if he had been given a copy of his consumer report prior to being terminated that he would have been able to avoid being terminated; and that DeCaro was apparently told at some juncture prior to termination that he was going to be fired on the basis of his marijuana conviction. *See* Def. SMF ¶¶ 65–67. Defendant notes that Branch 305 disputed Longmore's initial decision that DeCaro was ineligible for employment with USSA, and submitted supplemental information

to try to change Longmore's mind before her decision became final. *See* Def. Br. Class Cert. at 21; Def. SMF ¶ 66.[10]

The Court finds that DeCaro has standing to assert the Adverse Action Claim. He alleges—and it is undisputed—that he did not receive the two statutorily mandated documents. *See* Def. SMF ¶¶ 61, 70. While this omission may not have ultimately mattered—since Longmore stuck by her decision to fire Plaintiff even after the appeal, which appeared to include Plaintiff's explanation for the conviction—that in itself does not negate the original informational injury. The fact is that Plaintiff did not receive the information that the statute entitled him to, and this in itself constitutes an injury that gives rise to standing. The nature of this injury is akin to that upheld as sufficiently concrete in *Church*, and is fundamentally distinct from the bare procedural violations the Court finds to be alleged by way of the Disclosure Claim. Indeed, many of the principal cases Defendant cites in support of its argument that Plaintiffs lack standing for the Disclosure Claim appear to agree, in fact, that a total failure to provide statutorily mandated information confers

---

[10] Defendant appears to assume that the branch argued on DeCaro's behalf by proxy, referring to this supplementation as an "ersatz pre-adverse action notice procedure." *See* Def. Br. Class Cert. at 21. Defendant's argues in its brief on class certification that the fact that DeCaro did, by proxy, have an opportunity to dispute the results of his background check is a problem for purposes of typicality under Rule 23. *See* Def. Br. Class Cert. at 21–22. The Court will address this argument below in its discussion of class certification of the Adverse Action Class.

standing on the person deprived. *See, e.g., Landrum v. Blackbird Enters., LLC*, 214 F. Supp. 3d 566, 571 (S.D. Tex 2016) (acknowledging that "a statutory right to information is substantive"); *LaFollette v. RoBal, Inc.*, No. 1:16-cv-2592-WSD, 2017 WL 1174020, at *4 (N.D. Ga. Mar. 30, 2017) (same); *see also Church*, 654 F. App'x at 995 (finding plaintiff had standing based on informational injury of non-receipt of information mandated by statute).

Defendant cites one district court case in which a plaintiff was found to lack standing on a § 1681b(b)(3) claim on similar facts. *See* Def. Br. Class Cert. at 21 (citing *Boergert v. Kelly Servs., Inc.*, No. 2:15-cv-4185, 2016 WL 6693104, at *4 (W.D. Mo. Nov. 14, 2016)).[11] The defendant in *Boergert* fired the plaintiff based on information in the plaintiff's consumer report, but did not provide the plaintiff with a copy of the report before firing him. *See* 2016 WL 6693104, at *1. The court in *Boergert* found that the plaintiff lacked standing because he did not show that any of the information in the consumer report was inaccurate, or that if he had been given a copy of the report prior to the adverse action, the defendant would have made a different decision. *See id.* at *4. Writing that the plaintiff "has not shown any injury beyond the lack of access to the required information," the court indicated the

---

[11] Defendant also cites *Tyus v. United States Postal Service*, No. 15-cv-1467, 2016 WL 6108942, at *7 (E.D. Wis. Oct. 19, 2016). *See* Def. Br. Class Cert. at 21. *Tyus* is not analogous to this case, however, because the plaintiff in *Tyus* did receive a copy of his background report. *See* 2016 WL 6108942 at *2.

plaintiff failed to show he suffered from the harm that Congress sought to prevent, namely, a lost opportunity to challenge the information in the consumer report. *See id.* at *4; *accord Campbell v. Adecco USA, Inc.*, No. 2:16-cv-04059-NKL, 2017 WL 1476152, at *3 (W.D. Mo. Apr. 24, 2017).

The Court declines to follow *Boergert* and *Campbell*, which are not within the Eleventh Circuit. Although it is unpublished, the Court finds the Eleventh Circuit's opinion in *Church* to be highly persuasive, and to be obviously more persuasive authority than *Campbell* and *Boergert*. *Church* supports the view that even after *Spokeo*, Congress may elevate the right to receive information to the status of a legally cognizable injury. In *Church*, the plaintiff suffered a sufficient injury for standing because she did not receive a disclosure that FDCPA required the defendant to give her, even absent allegations of further consequential injury. *See* 654 F. App'x at 994–95. This view is also in accord with *Havens Realty*, in which the Supreme Court found that the "tester" plaintiff had standing for an informational injury of being lied to about apartment availability even though she was not herself shopping for apartments. *See* 455 U.S. at 381. A plaintiff need not, under these authorities, allege a harm beyond the non-receipt of required information to have standing.

Another court within this district, applying *Spokeo*, *Church*, and *Havens Realty*, recently found that a plaintiff asserting a § 1681b(b)(3) claim had standing based on the injury of not receiving a copy of her consumer report. *See O'Donnell v. RCO Legal, P.S., Inc.*, No. 1:17-cv-2072-ELR-LTW, 2018 WL 1866617 (N.D. Ga. Feb. 12, 2018), *report and recommendation adopted*, 2018 WL 1871946 (N.D. Ga. Mar. 22, 2018). The Magistrate Judge in *O'Donnell* found that Congress had elevated the procedural rights guaranteed by § 1681b(b)(3) to the status of legally cognizable injury, and that violations of that section created a risk of harm to those concrete interests. 2018 WL 1866617, at *6 (Report and Recommendation of Walker, M.J.) These interests included obtaining key information from the background report, contesting the accuracy of the background report, and having the opportunity to discuss any negative items in the background report with the prospective employer. *See id.* at *7. Judge Ross, adopting the Magistrate Judge's Report and Recommendation, stated that "[t]he crux of the injury here is not whether the information [in the plaintiff's consumer report] is accurate, but whether Defendant deprived Plaintiff of her right to information before rescinding its offer of employment." 2018 WL 1871946, at *4 (Ross, J.).

The Court finds the reasoning of *O'Donnell* persuasive, and finds that Plaintiff DeCaro suffered a material risk of harm to the same interests in this case.

Although DeCaro may have been told some of the information that the copy of his consumer report would have shown, he nevertheless lost the opportunity to view the entirety of his consumer report and discuss it with USSA, and did not receive a full summary of his rights under the FCRA required by § 1681b(b)(3)(A)(ii). These omissions are enough to support standing to assert the Adverse Action Claim.

B.     *Motion for Summary Judgment*

Defendant moves for summary judgment as to all claims asserted by Plaintiffs, asserting that there are no genuine issues of material fact with respect to Plaintiffs' claims, and that it is entitled to judgment as a matter of law as to all such claims. *See* Mot. Summ. J. [80] at 1–2. For the reasons discussed above, the Court concludes that Plaintiffs lack standing to assert the Disclosure Claim, therefore recommends that Plaintiff Stone's Disclosure Claim be remanded and that Plaintiff DeCaro's Disclosure Claim be dismissed without prejudice. In light of those recommended dispositions, it is not appropriate for the Court to consider the merits of those claims, and therefore simply recommends that Defendant's Motion for Summary Judgment be **DENIED** as moot as it relates to the Disclosure Claim. The following discussion will therefore relate solely to Plaintiff DeCaro's Adverse Action Claim.

1.      Summary Judgment Standard

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to

44

defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

###### 2.   Adverse Action Claim

Defendant does not dispute that it violated § 1681b(b)(3) by failing to send Plaintiff DeCaro the notice that it was required to provide him before taking adverse action. *See* Def. Br. at 21. Because Plaintiffs seek only statutory and punitive damages, however, Plaintiffs cannot recover unless Defendant is found to have violated the FCRA "willfully." 15 U.S.C. § 1681n(a). For that reason, Defendant would still be entitled to summary judgment on the Adverse Action Claim if the Court were to find as a matter of law that its conduct was not willful.

Defendant argues that Plaintiff cannot show that any alleged violation of 15 U.S.C. § 1681b(b)(3) was "willful" under the Supreme Court's ruling in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007). In *Safeco*, the Court held that the phrase "willfully fails to comply" in § 1681n(a) includes reckless violations of the FCRA. 551 U.S. at 57–60. The Court explained the required showing for a finding of recklessness:

> [A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless. . . .

*Safeco*, 551 U.S. at 69–70. In the case at hand, the Supreme Court found no reckless violation under that standard:

> This is not a case in which the business subject to the Act had the benefit of guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned it away from the view it took. . . . Given this dearth of guidance and the less-than-pellucid statutory text, Safeco's reading was not objectively unreasonable, and so falls well short of raising the "unjustifiably high risk" of violating the statute necessary for reckless liability.

*Id.* at 70.

Defendant states that it was aware of its obligation to provide an adverse action notice and that it hired S2Verify to send the notices. *See* Def. Br. at 23, Def. SMF ¶¶ 57, 59. As stated in the facts, above, Defendant states that S2Verify failed to send DeCaro his adverse action notice prior to his termination because of the deletion of an email address that would have, if it had not been deleted, resulted in S2Verify sending the notice. *See* Def. Br. at 24; Def. SMF ¶ 77.

Defendant states that Longmore confirmed with S2Verify on more than one occasion that pre-adverse action notices were being sent out appropriately, and that it was not aware that the notices were not being sent out until DeCaro filed suit. *See*

Def. Br. at 25; Def. SMF ¶¶ 72–75. For example, Longmore states in her Declaration that she met in person with Jim Zimbardi, president of S2Verify, "to ensure that S2Verify was complying with its contractual obligation to send adverse action notifications at the appropriate time." Def. SMF ¶ 72; *see* Longmore Decl. [80-6] ¶ 49. Defendant also cites Exhibit L to Longmore's Declaration, which reflects email correspondence between Longmore and Zimbardi from 2013, in which Longmore specifically instructs Zimbardi, "The adverse action letter should be sent 5 days after the pre-adverse action letter." *See* Longmore Decl., Ex. L [80-6] at 197–201. It is unknown who deleted the email address that would have triggered S2Verify to send notices. Def. SMF ¶ 78.

Defendant argues that a violation of the FCRA that results from an inadvertent mistake cannot be a willful violation. *See* Def. Br. at 22. Defendant cites two cases in which district courts declined to find willful violations of the FCRA where the employer had procedures in place to ensure FCRA compliance and yet made a mistake. *See id.* at 22–23. In *Lagrassa v. v. Jack Gaughen, LLC*, No. 1:09-cv-0770, 2011 WL 1257384, at *5 (M.D. Pa. Mar. 11, 2011), an applicant sued her prospective employer under § 1681b(b)(2) for failure to obtain her written authorization prior to obtaining a consumer report for employment purposes. The defendant had a standard practice of requesting consumer reports by entering

information that the prospective employee provided in the authorization form into an internet-based form provided by the consumer reporting agency. *Lagrassa*, 2011 WL 1257384 at *3. Presumably, the need to enter the information from an authorization form ensured that a completed authorization form was necessary before a consumer report could be requested. However, personnel for the defendant employer could not locate the plaintiff's authorization form after having obtained a consumer report on her. *Id.* at *4. Still, the employer determined that the previous 21 applicants' authorizations were all correctly obtained. *Id.* The court found that the plaintiff did not produce competent evidence that the employer's violation was knowing or reckless. *Id.* at *5. Moreover, the court found that the evidence supported a finding that there were procedures in place to ensure FCRA compliance, and that the incident with the plaintiff was a mistake. *Id.*

Second, in *Khoury v. Ford Motor Credit Co.*, No. 13-1149, 2013 WL 6631471 **4–5 (E.D. Mich. Dec. 17, 2013), the court granted summary judgment to the defendant, a car dealership, on a claim of willfully obtaining a consumer report without a proper purpose under § 1681b(f). The dealership admitted it had run a consumer report improperly, but the evidence showed it was a simple mistake. *See id.* at *5. Specifically, the plaintiff had given some of his personal information to the dealership when car shopping with his wife so that his wife could get his Ford

employee discount on a car, and the dealership initially, by mistake, obtained a consumer report on the plaintiff rather than on his wife. *See id.* at **1–2. The dealership also showed that it had procedures in place to train its employees about the FCRA. *See id.* at *5. In this case, Defendant argues that it is entitled to a finding of non-willfulness because the evidence shows that but for the inadvertent error of deleting the email address necessary to send the notice forms, DeCaro would have timely received it, and that Longmore reasonably believed S2Verify was sending the forms.

Ultimately, after carefully considering all of the evidence in the record, the Court agrees with Plaintiff DeCaro that this question of intent should be left to the jury and that summary judgment is not available on this quintessential issue of fact.

First, the issue is not, as it was in *Safeco*, whether a policy or procedure was reasonable in light of existing law. It is undisputed that DeCaro was entitled to notice, and Defendant does not argue that it was "reasonable" to decide to withhold notice. The argument, rather, is that the failure to provide notice was just a mistake. But while Defendant asserts in legal argument that this omission must have been mistaken, there is no evidence as to exactly what happened and who did what. All that is known is that this action resulted from an affirmative act of data deletion by Defendant's own employee. Viewing the evidence in the light most favorable to

DeCaro, although the scope of the issue is not clear, there is evidence to suggest that this problem was not isolated to just DeCaro.[12]  While an affirmative deletion of data could have been inadvertent, it also could have been intentional. Defendant asks the Court to assume the inference most favorable to itself, but the Court simply cannot do that in the context of a summary judgment motion.

Second, more specifically, Longmore's actions in this case could be interpreted as showing an intent to violate the pre-adverse notice rule, and/or knowledge that the rule was being violated. Here, Defendant has asserted that the pre-adverse action notice should have been (and Defendant argues that it believed that it had been) sent to Plaintiff DeCaro as of April 17, 2015, three days after when Longmore reviewed his report. *See* Zimbardi Decl. [78-10] ¶ 5. But in Longmore's Declaration, she states that on "[t]hat day," *i.e.*, the day that she concluded DeCaro was disqualified (April 14), "I notified the branch the DeCaro's employment should be terminated." *Id.* ¶ 41. Longmore went on to suggest that the only reason Plaintiff was allowed to temporarily keep working after "that day" was because of the Branch's appeal. *See Id*. Otherwise, Longmore's declaration could be interpreted, in the light most favorable to Plaintiff, as suggesting that the termination would have been implemented immediately after the negative review itself, *i.e.*, "that day,"

---

[12] These facts distinguish *Khoury* and *Lagrassa*, which appear to involve one-time errors, for which there was more explanation provided as to what happened.

necessarily before any pre-adverse action would be sent. This *could* suggest that Ms. Longmore knew that the adverse decision was being made before any notice, or was recklessly indifferent to the pre-action notice requirement.

This chronology could also suggest a violation of Defendant's policy in implementing FCRA notices. Defendant's policy is that "[u]nder USSA's policy, at least five days must have elapsed after the pre-adverse action notification had been mailed before the final decision could be made . . . ." [80-6] ¶ 47. While this specific time period is just a company policy as to how to implement the FCRA, Defendant's violation of its own policies would be relevant to the question of willfulness. Here, as noted above, the evidence could be interpreted as suggesting that Defendant made its decision to terminate DeCaro before any pre-adverse notice, and certainly prior to the passage of five days after such notice.

The sole question is whether Defendant has met its significant burden to convince the Court to take a quintessential factual issue such as willfulness away from the jury. The Court finds no basis to do so. Thus, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment [80] be **DENIED** with respect to Count II of the Complaint [26].[13]

---

[13] DeCaro cites two cases in support of his position that willfulness is necessarily a jury question when a semi-automated system is exclusively relied on, and mistakes in violation of the FCRA result. *See* Pl. Br. MSJ at 21 (citing *Bradshaw v. BAC*

C.    *Motion for Class Certification*

Plaintiffs move under Rule 23 of the Federal Rules of Civil Procedure to certify two classes, that is, a "Disclosure Class" and an "Adverse Action Class." Because the Court has found that Plaintiffs lack standing to assert the Disclosure Claim under Count I, and that the Disclosure Claim cannot proceed as currently stated in federal court, the Court will confine its discussion to Plaintiff DeCaro's motion to certify the Adverse Action Class.

Plaintiff DeCaro seeks to bring the Adverse Action Claim on behalf of a class (the "Adverse Action Class") with the following definition:

> All U.S. Security Associates, Inc. employees and job Applicants in the United States against whom adverse employment action was taken based, in whole or in part, on information contained in a consumer report procured by S2Verify, LLC, within two years of the filing of this complaint through the date of final judgment in this action who were not provided the proper pre-adverse notice as required by 15 U.S.C. § 1681b(b)(3)(A).

*See* Mot. Class Cert. at 12.

---

*Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1076 (D. Or. 2011); *Fregoso v. Wells Fargo Dealer Servs., Inc.*, CV 11-10089 SJO AGRX, 2012 WL 4903291, at *10 (C.D. Cal. Oct. 16, 2012)). Defendant contends that this part of Plaintiff's argument was improperly filed in excess of the page limit rules for briefs in the Local Rules of this Court because Plaintiff's brief is not double-spaced. The Court find this argument to be immaterial for reasons discussed in more detail as it relates to the class certification argument, below. In any event, these cases, and the offending pages, are not necessary to consider for purposes of considering the summary judgment issue, which should be denied regardless.

1.      Legal Standards on Class Certification

The class action is an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). The class action mechanism of Rule 23 of the Federal Rules of Civil Procedure was developed to accommodate interests including "the protection of the defendant from inconsistent obligations, the protection of the interests of absentees, the provision of a convenient and economical means for disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous litigants with similar claims." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 402–03 (1979); *see Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1246 (11th Cir. 2000).

The party seeking class certification bears the burden of proof to satisfy every element of Rule 23. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009). That is, Rule 23 does not set forth a "mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, the party seeking certification must "affirmatively demonstrate his compliance with the Rule." *Id.*

54

If a district court determines that the class is ascertainable, it must assess whether the putative class representative has satisfied all four of the prerequisites of Rule 23(a). *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016). That rule provides:

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
>> (1) the class is so numerous that joinder of all members is impracticable;
>>
>> (2) there are questions of law or fact common to the class;
>>
>> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>>
>> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23 (a). "These four requirements commonly are referred to as the prerequisites of numerosity, commonality, typicality, and adequacy of representation, and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (internal punctuation omitted). In addition to the requirements of Rule 23(a), at least one of the three requirements of Rule 23(b) must be met. *Carriuolo*, 823 F. 3d at 984. In this case, Plaintiffs seek to certify their proposed classes under Rule 23(b)(3), which provides:

> (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

. . . .

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). These two requirements are commonly referred to as predominance and superiority. *Owens v. Metropolitan Life Ins. Co.*, 323 F.R.D. 411, 419 (N.D. Ga. 2017).

A district court must conduct a "rigorous analysis" of the Rule 23 prerequisites before certifying a class. *Vega*, 564 F.3d at 1266. The likelihood of a plaintiff's success on the merits of a claim is not a relevant consideration. *Owens*, 323 F.R.D. at 419. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *AmGen Inc. v. Conn. Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013). If, however, a

question of law or fact *is* relevant to the certification determination, the district court "has a duty to actually decide it and not accept it as true or construe it in anybody's favor." *Brown*, 817 F.3d at 1234. "Questions concerning class certification are left to the sound discretion of the district court." *Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004).

### 2.    The Adverse Action Class

Plaintiff DeCaro argues that the Adverse Action Class is ascertainable because S2Verify has already identified those individuals who should have received pre-adverse notice based on the automated procedures. *See* Mot. Class Cert. at 14 (citing Zimbardi Dep. [85] 23:9–21). DeCaro also states that class members who have been subject to adverse action may be identified "by having Defendant examine its own employee records," *see id.* (citing Blanchard Decl., Ex. 2 [75-2] Def. Supp. Resp. to Contention Interrogs. ¶ 26), and by mailing a questionnaire to those who did not receive pre-adverse notice.

DeCaro states that there are approximately 100–450 persons for whom Defendant violated § 1681b(b)(3) by failing to provide pre-adverse action notice. *See* Mot. Class Cert. at 10 (citing Zimbardi Dep. 23:9–21). Thus, DeCaro argues that the Adverse Action Class is sufficiently numerous under Rule 23(a)(1) because generally a class of greater than 40 is sufficiently large. *See id.* at 16 (citing *Martinez*

*v. Mecca Farms, Inc.*, 213 F.R.D. 601, 605 (S.D. Fla. 2002)). With respect to commonality under Rule 23(a)(2), Plaintiff DeCaro argues that all class members have the same claim under § 1681b(b)(3) because the background check company S2Verify's deletion of an administrative email address caused all class members not to receive their pre-adverse action notice. *See id.* at 18. As to typicality under Rule 23(a)(3), DeCaro states that he has a typical claim because, like all class members, his claim is based on Defendant's policy and/or practice of failing to send pre-adverse action notices. *See id.* at 20. DeCaro cites his Declaration [75-5] in support of his adequacy as class representative under Rule 23(a)(4) on the Adverse Action class, and states that his interests are aligned with those of the class members. *See id.* at 21.

With regard to Rule 23(b)(3), DeCaro states that a common issue, whether Defendant's practices of sending pre-adverse action notices violated the FCRA, will predominate; and that the class action is the superior means of resolving the Adverse Action Claim because there are many potential plaintiffs with the same modest claims for only statutory and punitive damages that can be efficiently addressed in a class action. *See id.* at 19, 22–24.

Defendant raises three primary arguments against certification of the Adverse Action Class. First, Defendant argues that the errors that led to DeCaro's lack of

notice are not common or typical *vis-à-vis* the entire class. According to S2Verify President Jim Zimbardi, there were numerous identified problems that caused different class members to not receive pre-adverse action notifications, at least some of which were the fault of third parties. *See* Def. Br. Class Cert. [78] at 8–9, 23–24 (citing Zimbardi Decl. [80-10] ¶¶ 8–11). Zimbardi stated that S2Verify does not know what caused some applicants not to receive the pre-adverse action notification; that some applicants merely received their pre-adverse action notification late rather than not at all; and that some applicants may have received the notification later than they should have, but not so late as to have violated the FCRA. *See id.* at 8–9 (citing Zimbardi Decl. [80-10] ¶¶ 8–11). According to Defendant, the nature of the problem and, crucially, whether any violation was willful, will present different questions based on what happened in any particular instance. Defendant thus argues that Plaintiff DeCaro's claim is atypical of the claims of class members whose non-receipt or late receipt of a pre-adverse action notification resulted from different causes. *See id.* at 19–20, 22–23.

Second, Defendant argues that, because § 1681b(b)(3) only applies to persons who suffer "adverse action *based in whole or in part on*" a consumer report, any class action would necessarily devolve into individualized inquiries as to whether and why each separate class member suffered an adverse employment action. This

problem impacts the ascertainability of the class itself—because the class cannot be properly ascertained without an individualized determination—and the efficiency of the class action mechanism, as individual questions will predominate.

Third, Defendant argues that DeCaro's claims are atypical of the class, and that he is an inadequate representative, because he did in fact have the opportunity to dispute the inaccuracies of his report before he was terminated. *See* Def. Br. Class Cert. at 20–21. As explained above, according to Defendant, this circumstance raises anecdotal questions as to DeCaro's standing, and implicates whether other individuals denied the disclosures at issue may lack standing on similar grounds.

a.    Commonality/Typicality

Class members' claims do not need to be identical to satisfy the typicality requirement. *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012). A class representative must, however, "possess the same interest and suffer the same injury as the class members." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). To satisfy typicality,

> [T]here must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class. A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual

position of the representative markedly differs from that of other members of the class.

*Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).

To meet the related prerequisite of commonality, meanwhile, a named plaintiff must show the presence of issues of law or fact common to the entire class. Fed. R. Civ. P. 23(a)(2). The commonality requirement of Rule 23(a)(2) "looks not to the raising of common questions . . .  but rather the capacity of a classwide proceeding to generate common answers apt to derive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks omitted). Even a single common question may be sufficient to satisfy the commonality requirement, but the issues must be susceptible to class-wide proof. *Id.* at 349–50 (2011). That is, the common issue must be "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Of course, at a very general level, all of the class members in this case suffered the common injury of not receiving pre-adverse action notification. But DeCaro does not suggest that this alone justifies a class action. Rather, according to DeCaro's initial brief, he satisfies the related concepts of commonality and typicality primarily because "no pre-adverse action notices were sent to the

estimated 100–450 [Adverse Action] Class members because someone working for Defendant removed the administrative e-mail address from the system [that Defendant and its vendor, S2Verify] shared that was utilized to send information back and forth between the two." Pl. Br. Class. Cert. [75] at 17–18. In other words, the injuries suffered by the various class members are all rooted in, and linked by, the same original affirmative act of data spoliation from "someone working for Defendant."

This asserted link, however, does not appear to be accurate. As Defendant points out, and DeCaro does not appear to dispute in reply, Zimbardi identified several different reasons why different applicants to USSA received their pre-adverse action notification late or not at all. Twenty-five people did not receive a pre-adverse action letter because "the administrative email address had been deleted inadvertently." Zimbardi Decl. ¶ 7. Eighteen did not receive it because the sender of the email converted the format of the report from HTML to PDF; and three people received the notification late for the same reason. *Id.* ¶ 8. For 106 people, "the administrative email address had been removed and the report had been converted from HTML to PDF." *Id.* ¶ 9. Among those 106, 70 applicants did not receive the notice but 36 received it late. *Id.* In addition to other glitches, another 110 people did

not receive the notice, and 23 received it late, because of an internal mail server error from a third party that S2Verify used. *Id.* ¶ 11.

Thus, only a subset of this proposed class was denied pre-adverse action notice on the basis of a missing or deleted administrative email link. It is not clear from the evidence how many failed notices resulted from this particular problem. Indeed, the evidence does not clarify whether the email deletion was the result of one or more separate incidents. Zimbardi stated that the problem with respect to DeCaro was that a USSA representative within the *specific branch* that hired DeCaro deleted an administrative email address that caused notice of a completed or updated report to be sent to S2Verify. *Id.* ¶ 5. It is not at all clear if a substantial number of other individuals were specifically affected by this particular deletion in this particular branch or whether, instead, there were multiple such errors at different offices over time. Thus, there does not appear to be evidence of a common policy or practice that led to these various notification failures. Rather, the evidence suggests a series of anecdotal problems at various different offices and even different companies.

The circumstances that led to these problems are relevant to the key question of willfulness. That these circumstances appear to arise from different events or actions, by different people, in different offices and even different companies,

therefore cuts against a finding of commonality or typicality. For example, the Court in its summary judgment analysis finds that a jury in assessing willfulness *vis-à-vis* DeCaro's claim could rely on the potentially significant fact that an unidentified employee of Defendant affirmatively deleted necessary data. But this problem is fundamentally different from the one that caused notification problems in over 100 other cases: a glitch suffered by the computer systems of a third-party contracting with S2Verify. *See* Zimbardi Decl. ¶ 11. Plainly, a glitch in a computer system by a vendor not even in direct privity with Defendant seems less probative of Defendant's intent than—and hardly suggests any grand interconnected scheme with—an affirmative act of data deletion by Defendant's own employee. Similarly, an affirmative deletion of data is very different in nature from merely sending a report in unsupported computer format (HTML vs. PDF). The latter error is blamed, however, for at least two dozen instances of failed or tardy disclosures in the potential class. Plaintiff DeCaro does not show how a jury finding of willfulness based on the facts of his case should necessarily mean that—or would shed substantial light as to whether—Defendant also acted willfully in these other very different situations.

Indeed, the Court, in recommending denial of summary judgment on willfulness, considers even more in the way of unique, case-specific facts, including

the chronology of when Longmore made and communicated her specific decision to terminate DeCaro. These facts simply do not pertain in any significant way to other employees' situations, or at least DeCaro does not show otherwise.

DeCaro in his reply brief on class certification changed his focus from the alleged commonality in the original email deletion error, to Defendant's general failure to institute "quality control" oversight over S2Verify. *See* Pl. Reply Br. Class Cert [84] at 13–14. According to DeCaro, Defendant's "lack of quality control and organizational systems" was responsible for its failure to catch the variety of notification errors that occurred, regardless of their differing origins. This lack of control, according to DeCaro, is itself a "common issue" that justifies a class action.

DeCaro, however, does not present any overall, common evidence of "lack of quality control or organizational systems," at least that could reach the level of establishing willfulness or even recklessness. First, there is no evidence presented to the Court that anyone from Defendant knew, or had reason to know because of the scope of this problem, that some notices were not being sent out in a timely way from S2Verify. Indeed, while the lack of notices during this time period was not isolated to DeCaro, no evidence was presented to suggest that the numbers at issue

were significant relative to Defendants' overall applicant pool, or that for any other reason this problem was likely noticed by Defendant but ignored.[14]

Second, the sending of notices was a ministerial matter that Defendant was entitled to rely on a professional outside service provider to perform. DeCaro cites cases that the use of "semi-automated" systems is itself some evidence of reckless conduct under the FCRA. *See* Pl. Br. MSJ at 21 (citing *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1076 (D. Or. 2011); *Fregoso v. Wells Fargo Dealer Servs., Inc.*, CV 11-10089 SJO AGRX, 2012 WL 4903291, at *10 (C.D. Cal. Oct. 16, 2012)). These cases are entirely distinguishable, however, as they relate to the affirmative obligations of furnishers and consumer reporting agencies to investigate consumer claims of false reporting of credit information. In other words, if a consumer disputes an alleged false entry, some courts have questioned the practice of a reporting or furnishing firm delegating its responsibility to investigate the accuracy of that information to a mere automated process. By contrast, this case does not involve investigating any disputes, or any other act requiring the exercise of human judgment. Rather, Defendant simply hired a professional service provider, and used computer systems to share information with

---

[14] Indeed, that 100–400 individuals failed to receive pre-adverse action notice is a vastly smaller number than the overall group of employment applicants, which Plaintiffs allege was over 60,000 in the Disclosure Class. *See* Mot. Class Cert. at 13.

that firm, to facilitate the ministerial act of mailing out a form letter after a code is entered into a system.

Obviously, an employer cannot shield itself from liability by hiding behind a vendor. An employer that actually knows of, deliberately contributes to, or that even deliberately or recklessly disregards the failings of its vendor may be held to the requisite standards of scienter. But DeCaro has not presented evidence that Defendant's use of S2Verify to accomplish the ministerial acts of mailing notices in this case was itself suggestive of recklessness or otherwise questionable.

Of course, the merits of DeCaro's willfulness claim is not pertinent to the Court in considering whether to certify a class. But DeCaro has not shown the existence of sufficiently material common evidentiary or legal issues to bind together this class. The evidence that it has presented on issues such as willfulness is principally individualized in nature. This appears to defeat class certification or at least does not support certification of the broadly-worded class proposed by DeCaro.

b.    Ascertainability/Predominance

The Court is perhaps even more concerned with the second issue raised by Defendant, ascertainability. It is well established that a plaintiff seeking to represent a class must establish that the proposed class is "adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012).

To meet the requirement of ascertainability, a class definition must contain "*objective criteria* that allow for class members to be identified in an administratively feasible way." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (emphasis added). A plaintiff may rely on the defendant's business records to identify the members of a class. *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 788 (11th Cir. 2014). However, the plaintiff must establish that the records are "useful for identification purposes, and that identification will be administratively feasible." *Karhu*, 621 F. App'x at 948. The identification of class members "is administratively feasible when it is a 'manageable process that does not require much, if any, individual inquiry.'" *In re Delta/AirTran Baggage Fee Antitrust Litigation*, 317 F.R.D. 675, 681 (N.D. Ga. 2016) (Batten, J.) (quoting *Bussey*, 562 F. App'x at 787).

These principles "do not suggest that *no* level of inquiry as to the identity of class members can ever be undertaken. If that were the case, no Rule 23(b)(3) class could ever be certified." *Id.* (quoting *Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3d Cir. 2015)). "[T]he size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539–40 (6th Cir. 2012). Still, "class certification is not appropriate if the court is called on to engage in individualized

determinations of disputed fact in order to ascertain a person's membership in the class." *Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 665 (N.D. Ala. 2010).

The proposed class definition itself raises a red flag as to ascertainability. The class is not defined with objective criteria, but rather is defined, conclusorily, in terms of the ultimate merits question. The Adverse Action Class is defined as including those applicants and employees "against whom adverse employment action was taken based, in whole or in part, on information contained in a consumer report . . . . who were not provided the proper pre-adverse notice as required. . . ." *See* Mot. Class Cert. at 12. This provides no actual objective criteria Rather, the proposed class is essentially defined as everyone else who is later determined, presumably based on a review of the evidence, to also have meritorious claims. This approach to class identification is, simply, backwards. *See, e.g., Alhassid v. Bank of Am., N.A.*, 307 F.R.D. 684, 694 (S.D. Fla. 2015) (finding classes unascertainable where merits determination was essential element in class composition); *Likes v. DHL Express*, 288 F.R.D. 524, 531–32 (N.D. Ala. 2012) (finding class unascertainable where preliminary merits questions would be necessary to resolve before court could determine who would be included in class).

The fundamental problem is that, to ascertain who is in the class, and whether each person ultimately has a claim, would require an individualized determination as to (1) whether that person received notice, (2) whether that person suffered an adverse action, and (3) whether that person's adverse action was based on his or her credit report. There is no objective criteria proposed to define who those people are. And, because the class is defined in terms of the ultimate merits, determining the identities of these individuals would be tantamount to also determining and adjudicating their ultimate entitlement to relief.

Defendant has shown that making these determinations may involve review of personnel files or other individualized evidence. Indeed, determining the nature of the employment decision in DeCaro's case required review of his personnel file, including the appeal correspondence, as well as Longmore's explanation of her decision. In the end, Longmore states that she was not "persuaded" to make an exception and allow DeCaro to keep his employment. But a review of the file was necessary determine these necessary facts, that is, that DeCaro suffered an adverse action because of his negative report. Defendant provides examples of certain other applicants who had an apparently disqualifying credit report but—according to an individualized review of their records—were denied jobs for *other* reasons. *See* Def.

Br. Class Cert. [78] at 24, n. 12 (citing Yates Decl. ¶ 11; Yates Dep. 48:1–50:13, Ex. P., Zimbardi Dep. 19:23–20:23, 25:15–26:8, Ex. 12s2).

DeCaro's only response to these problems is to suggest that, to ascertain the class, "[n]otice can simply be mailed to those individuals already identified by S2Verify as having not received a pre-adverse [action] notice, and they can indicate whether they also suffered an adverse action if/when they join the class." Pl. Reply Br. Class Cert. [84] at 13. DeCaro supplies no authority for this notion, that is, that a class can be ascertained by sending out a questionnaire to possible members and asking if they believe that they meet the criteria. To the contrary, by definition this procedure is subjective and individualized.

For the same reasons, even assuming ascertainability, DeCaro cannot show that individual questions would not ultimately predominate in this litigation. "Common issues will not predominate over individual questions if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009). Whether DeCaro received and was entitled to pre-adverse action notice would seemingly have no impact on whether some other employee received and was entitled to such notice. Whether that other employee has a claim, rather, would depend entirely on the evidence specific

71

to that employee, including the business records showing whether that employee received notice, how that employee's credit report was graded, and, crucially, whether that employee suffered any adverse action as a result. As discussed above, the investigation and potential adjudication of that claim would involve review of records, entries in computer files, and perhaps personnel records and even in some cases testimony, little if any of which would specifically relate to DeCaro at all.

Of course, the potential class members' cases would raise some common questions, in terms of understanding the system employed by Defendant and S2Verify; what codes were supposed to trigger notices; how to read and understand the business records pertaining to some of the issues (including records from ApplicantStack); and other matters. But these are largely matters of background. DeCaro does not explain how these issues would predominate over the inherently individualized exercise in determining what employees were subjected to adverse actions and why—and whether violations resulting from a variety of different causes all reflected Defendant's willful culpability.

Accordingly, the Court **RECOMMENDS** that the Motion for Class Certification be **DENIED** as to the Adverse Action Class.

## IV.   CONCLUSION AND RECOMMENDATION

**IT IS RECOMMENDED** that Plaintiff Stone's Disclosure Claim in Count I of the Complaint [26] be **REMANDED** to the Superior Court of Los Angeles County, California, and that DeCaro's Disclosure Claim in Count I of the Complaint [26] be **DISMISSED without prejudice** for lack of subject-matter jurisdiction.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion for Summary Judgment [80] be **DENIED** with respect to Plaintiff DeCaro's Adverse Action Claim in Count II of the Complaint [26], and that the Motion for Class Certification [75] be **DENIED** as to the Adverse Action Class.

As this is a final report and recommendation, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 31st day of May, 2018.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE